UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL COLE, | ) | CASE NO.  1:23-CV-01093 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | |
| ASHTABULA COUNTY, *et al.*, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

Before the Court is the Motion for Summary Judgment (Doc. 25) filed by Defendants

Ashtabula County, Ashtabula County Sheriff's Department, William Niemi, Tammy Antoun,

Dale Locher, Merissa (Moffett) Currier, Brian Whitney, Cole Farina, Mark Jackson, and Taryn

Siemers (collectively "Defendants").  Plaintiff Michael Cole responded in opposition (Doc. 27),

Defendants replied (Doc. 30), and Plaintiff sur-replied with leave of Court (Doc. 32-1).  Also

before the Court is Plaintiff's fully briefed Motion to Strike All or Portions of the Affidavits

Submitted by Defendants in Support of Summary Judgment.  (Docs. 29, 31, 33.)

For the reasons stated herein, Defendants' Motion for Summary Judgment is GRANTED.

Plaintiff's Motion to Strike All or Portions of the Affidavits Submitted by Defendants in Support

of Summary Judgment is DENIED.

## I.     BACKGROUND

### A.     Undisputed Facts

Plaintiff Michael Cole brings this case as the administrator of the Estate of Branden

Knight.  (Doc. 1-1 at ¶ 4.)

On February 23, 2022, Knight was arrested and booked on a felony charge for failure to comply with an order of a police officer. (Doc. 25-2 at ¶ 15.) At booking, Knight was subject to a pat down search. (*Id.* at ¶ 9; Doc. 25-3 at ¶ 6.) On May 1, 2022, Knight died of a drug overdose while incarcerated as a pretrial detainee in the Ashtabula County Jail (the "Jail"). (Doc. 25-2 at ¶¶ 15, 16.)

### 1.     April 29, 2022

On April 29, 2022, Sergeant Scott Daniels was the officer-in-charge of Ashtabula County Sheriff's Office ("Sheriff's Office") road deputies and dispatch. (Doc. 25-1 at ¶ 4.) He received a call from Ashtabula City Police Officer John Bainton. (*Id.*) Bainton told him officers arrested Benjamin Tressler on information that Tressler possessed approximately 12 to 14 grams of heroin. (Doc. 28-3 at 502.)[1] Bainton also said Tressler may have concealed drugs in his rectum. (Doc. 25-1 at ¶ 4.)

Daniels sent Sheriff Deputy Michael Talbert to meet with the arresting officers. (*Id.* at ¶ 5.) Daniels also informed Jail Corporal Dale Locher that Tressler may have drugs on his person and possibly concealed in his rectum. (*Id.* at ¶ 6.)

Talbert met the arresting officers. (Doc. 25-9 at ¶ 4.) One officer told Talbert that Tressler was holding narcotics and suggested Talbert check the back seat of his cruiser before transporting Tressler. (*Id.*) After Tressler was removed from the arresting officers' cruiser, Talbert handcuffed Tressler, patted him down, and placed him in his vehicle. (*Id.* at ¶ 5.) A bag of suspected narcotics was on the back seat of the arresting officers' cruiser. (*Id.*) Talbert

---

[1] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

recalled the officers stated, "yep he got it out" and "he dumped it in my seat." (*Id.* at ¶ 6.) The recovered bag contained 4-5 grams of a powdery substance. (Doc. 28-3 at 503.)

Talbert drove Tressler to the Jail. (Doc. 25-9 at ¶ 7.) They arrived at approximately 9:18 PM on April 29, 2022. (*Id.*) Talbert told booking officers that Tressler was suspected of possessing drugs and that drugs were found dropped in the back seat of the arresting officers' police cruiser. (*Id.*) Tressler was patted down and strip searched. (Doc. 25-3 at ¶ 14; Doc. 25-6 at ¶ 8.) No contraband was found. (Doc. 25-3 at ¶ 16; Doc. 25-6 at ¶ 12.) Tressler was not subjected to a body cavity or bend and cough search. (Doc. 25-3 at ¶ 17.)

### 2. April 30-May 1, 2022

On the night of April 30, 2022, Corporal Locher and Officers Taryn Siemers, Merissa (Moffett) Currier, Cole Farina, Brian Whitney, and Mark Jackson were working the night shift at the Jail. (Doc. 25-3 at ¶ 18; Doc. 25-4 at ¶ 6; Doc. 25-5 at ¶ 6; Doc. 25-6 at ¶ 13; Doc. 25-7 at ¶ 6.) The shift began on April 30, 2022, at 7:00 PM, and went until May 1, 2022, at 7:00 AM. (*Id.*) Shortly after midnight on May 1, 2022, Currier noticed inmate Andrew Hommes, housed in Jail Unit 3 East (the "Unit"), acting strangely. (Doc. 25-4 at ¶ 7.) He was swaying and nodding off while standing. (*Id.*) Currier told this to Locher. (*Id.* at ¶ 8.) Hommes was brought to the booking area for observation and testing. (*Id.*; Doc. 25-3 at ¶ 19.) When Hommes arrived at booking, it was clear Hommes was under the influence. (Doc. 25-4 at ¶ 9; Doc. 25-3 at ¶ 19.)

Currier, Whitney, and Jackson reviewed security footage from the previous day to determine if Hommes had been using drugs in the facility. (Doc. 25-4 at ¶ 10; Doc. 25-5 at ¶ 8.) They did not observe drug use but did observe some erratic behavior from other individuals in the Unit. (*Id.*) Officers removed those individuals from the Unit. (*Id.*) The also removed others who were known drug users or friends of Hommes. (*Id.*) The removed individuals included

Cory Newsome, Justin Stroud, Joshua Stokes, and Knight.[2]  (*Id.*)  All were moved to the chapel

area for strip searches and then to the booking area for drug testing and observation.  (Doc. 25-3

at ¶ 20; Doc. 25-4 at ¶ 10; Doc. 25-5 at ¶ 8.)  Knight was not acting strangely or showing any

indication he was under the influence.  (Doc. 25-3 at ¶¶ 21, 25, 30; Doc. 25-4 at ¶¶ 11, 19; Doc.

25-5 at ¶¶ 9, 15, 17; Doc. 25-6 at ¶¶ 17, 20, 21; Doc. 25-7 at ¶¶ 9, 11.)

Currier and Siemers conducted a "shakedown" search of the Unit.  (Doc. 25-4 at ¶ 12.)

They searched the individuals' personal belongings, the windows, doors, bathrooms, and

curtains.  (*Id.*)  No contraband was found in any common area of the Unit or in the bunk areas for

Hommes, Newsome, Stroud, Stokes, or Knight.  (*Id.* at ¶ 13.)  Siemers discovered a broken

condom in Tressler's bunk area.  (*Id.*)  It was collected for testing and reported to Locher.  (*Id.*;

Doc. 25-3 at ¶ 29.)

During the strip searches, individuals removed all clothes and officers conducted  a visual

examination.  (Doc. 25-5 at ¶ 12.)  Officers also tested clothing, including undergarments and

socks, by patting, pinching, or crushing the clothing to detect contraband.  (*Id.*)  Knight was strip

searched.  (Doc. 25-3 at ¶ 22; Doc. 25-5 at ¶¶ 11, 13; Doc. 25-7 at ¶¶ 7, 8.)  A Strip Search

Report Form was completed.  (Doc. 25-3 at ¶ 23; Doc. 25-3 at 324.)  No contraband was found

during the strip search of Knight or any other individual.  (Doc. 25-5 at ¶ 13; Doc. 25-7 at ¶ 10.)

Tressler was placed in lockup.  (Doc. 25-3 at ¶ 20.)

The inmates were drug tested, except for Hommes.  (Doc. 25-3 at ¶ 24; Doc. 25-4 at ¶ 14;

Doc. 25-5 at ¶ 14.)  Hommes admitted he would test positive.  (*Id.*)  Knight and the others tested

positive for drugs.  (*Id.*)  Knight's test results showed heroin, synthetic cannabis, methadone, and

---

[2] While Knight was a pretrial detainee, the record does not specify whether the other removed
individuals were pretrial detainees or sentenced prisoners.

tramadol.  (Doc. 25-1 at 305; Doc. 28-1 at 454.)  The drug kits did not indicate how long drugs had been in their systems or to what degree.  (Doc. 25-3 at ¶ 24; Doc. 25-4 at ¶ 15; Doc. 25-5 at ¶ 14.)

The individuals were also taken to the booking area for additional observation and vitals checks.  (Doc. 25-3 at ¶ 26; Doc. 25-4 at ¶¶ 16, 17.)  Knight told Currier he had "used" the previous night.  (Doc. 25-4 at ¶ 18.)  He denied having additional contraband.  (*Id.*)  Currier took Knight's vitals.  (*Id.* at ¶ 16; Doc. 25-3 at ¶ 27.)  She recalled his vitals were normal.  (Doc. 25-4 at ¶ 16.)  The only inmate with slightly abnormal vital signs was Hommes, who had an elevated heart rate.  (*Id.*)  An Emergency Medical Response Report was completed for Hommes.  (Doc. 28-1 at 444.)  Hommes remained under visual observation until his heart rate went down.  (*Id.*)

Knight acted normally during observation.  (Doc. 25-3 at ¶¶ 21, 25, 30; Doc. 25-4 at ¶¶ 11, 19; Doc. 25-5 at ¶¶ 9, 15, 17; Doc. 25-6 at ¶¶ 17, 20, 21; Doc. 25-7 at ¶¶ 9, 11.)  The officers did not observe Knight to be in any medical distress.  (*Id.*)  The vital readings and observation were not concerning to Locher and did not prompt him to contact the nurse or other medical staff.  (Doc. 25-3 at ¶ 27.)  Because there was no finding of any remaining drugs or contraband in the Unit, Locher returned Knight to the Unit approximately one hour after he was removed from it.  (Doc. 25-3 at ¶ 30.)  Locher then began writing up rule violations for the individuals who possessed contraband.  (*Id.* at ¶ 31.)

It was around 2:55 AM when Knight and the other individuals were returned to the Unit.  (*Id.* at ¶ 30.)  They were monitored on the surveillance camera and through hourly security checks.  (Doc. 25-2 at ¶ 21; Doc. 25-3 at ¶ 33; Doc. 25-4 at ¶¶ 20, 21; Doc. 25-5 at ¶ 18; Doc. 25-6 at ¶ 22.)  Hourly security checks occurred at 3:16 AM, 3:43 AM, and 4:43 AM.  (Doc. 25-2 at ¶ 21.)  All areas of the Unit were monitored by surveillance cameras, except for the

bathrooms.  (Doc. 25-3 at ¶ 34.)  At the 3:00 AM check, Knight was in the bathroom for about

16 minutes.  (Doc. 25-1 at ¶ 16.)  He told Currier he was getting ready for bed.  (Doc. 25-4 at

¶ 20.)  He went to the bathroom again around 3:19 AM and returned to his bunk at 3:21 AM.

(Doc. 25-1 at ¶ 16.)  Officers continued to monitor the surveillance cameras.  (Doc. 25-4 at ¶ 21;

Doc. 25-6 at ¶ 22.)  There was no sign that Knight was in distress after he returned to the Unit.

(Doc. 25-3 at ¶ 33; Doc. 25-4 at ¶ 21; Doc. 25-5 at ¶ 18; Doc. 25-6 at ¶ 22; Doc. 25-7 at ¶ 14.)

He appeared to have fallen asleep in his bunk.  (Doc. 25-4 at ¶ 21.)

   At 5:45 AM, Currier, Whitney, and Farina, arrived for another security check of the Unit.

(Doc. 25-4 at ¶ 22; Doc. 25-5 at ¶ 19; Doc. 25-6 at ¶ 23.)  Currier noticed Knight had a gray skin

tone.  (*Id.*)  Currier yelled out, but Knight did not respond.  (*Id.*)  Currier called for Whitney and

Farina.  (*Id.*)  Whitney began performing CPR on Knight.  (*Id.*)  Currier called for Locher over

the radio and requested EMS immediately.  (Doc. 25-3 at ¶ 35.)  Currier ran for Narcan.  (Doc.

25-4 at ¶ 22; Doc. 25-7 at ¶ 15.)  Farina also performed CPR on Knight.  (Doc. 25-6 at ¶ 23.)

Currier grabbed a defibrillator machine, but it did not register a pulse or distribute a shock.

(Doc. 25-4 at ¶ 22.)  Sergeant Daniels attempted CPR and administered Narcan.  (Doc. 25-1 at

¶¶ 9, 10; Doc. 25-4 at ¶ 23.)  EMS arrived around 6:00 AM.  (Doc. 25-1 at ¶ 11; Doc. 25-3 at

¶ 35; Doc. 25-4 at ¶ 23; Doc. 25-5 at ¶ 19; Doc. 25-6 at ¶ 23; Doc. 25-7 at ¶ 16.)  Knight was

pronounced dead shortly thereafter.  (*Id.*)

   **3.**  **Post-Incident Investigation**

   Jail Administrator Lieutenant Tammy Antoun reviewed security footage from May 1,

2022, to determine how Knight was able to use drugs in the Jail.  (Doc. 25-2 at ¶ 17.)  The

Sheriff's Office also investigated the incident and reviewed footage.  (Doc. 25-1 at ¶ 15; Doc.

25-10 at ¶ 3.)  No video footage showed Knight using drugs.  (Doc. 25-1 at ¶¶ 15, 16, 17; Doc.

25-2 at ¶¶ 18, 21, 22, 24.)  Knight was seen going into the bathroom two times after 3:00 AM

before appearing to go to sleep around 3:21 AM. (*Id.*) There were no security cameras in the bathroom. (*Id.*) Knight was last observed moving on camera at approximately 3:44 AM. (*Id.*)

The Coroner's Office conducted Knight's autopsy and toxicology report. (Doc. 25-10 at ¶ 6.) The Coroner's Office discovered the toe end of one of Knight's socks had a makeshift cloth pocket sewn on using a mattress string. (*Id.* at ¶¶ 5, 6.) Inside the pocket was a small bag containing a powdery substance. (*Id.* at ¶ 6.) Testing revealed the substance in Knight's sock contained heroin, tramadol, and fentanyl. (*Id.* at ¶ 7.) The investigation determined Tressler brought this substance into the Jail. (Doc. 28-4 at 540-41; Doc. 28-5 at 561.)

The internal investigation concluded Jail staff acted appropriately. (Doc. 25-10 at ¶ 8.) Tressler was referred to the prosecutor's office to face possible charges. (*Id.* at ¶ 9.) Knight is the only inmate overdose officials recalled during their tenure at the Jail. (Doc. 25-2 at ¶ 16; Doc. 25-3 at ¶ 36; Doc. 25-4 at ¶ 25; Doc. 25-5 at ¶ 21; Doc. 25-6 at ¶ 25; Doc. 25-7 at ¶ 18.)

### 4.      Jail Training and Policies

When hired, corrections officers received the Ashtabula County Jail Policy and Procedure Manual. (Doc. 25-2 at ¶ 7; Doc. 25-3 at ¶ 5.) Any changes to Jail policies and procedures were reviewed with corrections officers. (*Id.*) Corrections officers were trained upon hire and while on the job on how to detect contraband. (Doc. 25-2 at ¶ 8; Doc. 25-3 at ¶ 8; Doc. 25-4 at ¶ 5; Doc. 25-5 at ¶ 5; Doc. 25-6 at ¶ 4; Doc. 25-7 at ¶ 5.) Through in-service training, officers also learned about fentanyl and drug use, including how to spot overdose symptoms. (Doc. 25-4 at ¶ 4; Doc. 25-5 at ¶ 4; Doc. 25-6 at ¶ 3; Doc. 25-7 at ¶ 3.) To prepare for a possible medical incident, including a drug overdose, officers received basic first aid training upon hire. (Doc. 25-2 at ¶ 4; Doc. 25-3 at ¶ 4; Doc. 25-4 at ¶ 3; Doc. 25-5 at ¶ 3; Doc. 25-6 at ¶ 3; Doc. 25-7 at ¶ 3; Doc. 25-8 at ¶¶ 6, 7.) Officers refreshed this training every two years. (*Id.*) Officers were also instructed how to recognize if someone was in medical distress, how to take vitals, how to

administer Narcan, and how to pass medications.  (Doc. 25-2 at ¶ 5; Doc. 25-4 at ¶ 3; Doc. 25-5

at ¶ 3; Doc. 25-6 at ¶ 3; Doc. 25-7 at ¶ 3; Doc. 25-8 at ¶ 6.)  Corrections officers were not

medical personnel.  (Doc. 25-2 at ¶ 6.)  They were not trained to make medical decisions.  (*Id.*)

They were trained to provide basic care until individuals could be seen by medical personnel.

(*Id.*)  Nurse Patty Hammers was in the Jail on Monday through Friday.  (Doc. 25-8 at ¶¶ 2-4.)

Dr. Carla Baster was always on call.  (*Id.*)

At booking, more intrusive kinds of searches were available to corrections officers.

(Doc. 25-2 at ¶ 10; Doc. 25-3 at ¶ 7.)  These searches included rectal cavity searches.  (*Id.*)

Rectal cavity searches required a valid search warrant.  (*Id.*)  Per policy, even if an arrestee was

suspected of carrying drugs through his rectal cavity and probable cause existed, the arresting

officer obtained a search warrant.  (Doc. 25-2 at ¶ 11; Doc. 25-3 at ¶ 8.)  The detainee was then

taken to a local hospital to be searched.  (*Id.*)  If arrestees were suspected of being under the

influence of drugs or alcohol during intake, they were either monitored in the booking area for

signs of medical distress or, if they were already displaying symptoms of serious intoxication,

they would not be accepted into the facility.  (Doc. 25-2 at ¶ 12; Doc. 25-3 at ¶ 9.)

Although individuals attempted to introduce contraband into the Jail, such attempts were

almost always prevented by pat down and strip searches.  (Doc. 25-2 at ¶ 14; Doc. 25-3 at ¶ 38;

Doc. 25-4 at ¶ 27; Doc. 25-5 at ¶ 23.)  Within the male population, individuals rarely succeeded

in getting contraband into the Jail.  (Doc. 25-2 at ¶ 14; Doc. 25-3 at ¶ 37; Doc. 25-4 at ¶ 26; Doc.

25-5 at ¶ 22.)

### 5.    Policy 5120:1-8-09(A).  Medical Care.

**Policy**.  All inmates at the Ashtabula County Jail will be provided health care.  Medical

care at the jail shall be delivered under the direction of a designated physician, licensed to

practice medicine in the State of Ohio, pursuant to a written contract and through the use of

health trained personnel as defined in section 5120: 1-8-09(0).  No correction officer or other employee will summarily or arbitrarily deny an inmate request for medical services for disciplinary reasons or based on his or her classification status.

Policies in this section shall be approved on annual basis by the jail physician.

**Procedure**.

1.  Health and medical care will be provided in a reasonable and timely manner either by the medical officer, the nurse, or the jail physician, appropriately credentialed according to the licensure, certification, and registration requirements of Ohio.  Verification of current credentials shall be on file at the jail.  Health care staff will work in accordance with profession-specific job descriptions at the direction of the medical staff.

2.  Emergency medical, dental, and mental health care services shall be available 24 hours per day.  An "Emergency Medical Response Report", Appendix DD, shall be completed by the shift supervisor or his designee when an inmate requires emergency medical, dental, or mental health care.  In the event that emergency care is required, the shift supervisor shall:

A.  Contact the on duty physician , nurse, or medical officer.

B.  If none of the above are on duty, Jefferson Rescue shall be contacted and dispatched to the jail.

C.  If it is determined that the inmate needs to be transported to the hospital, the inmate will be transported to the Ashtabula County Medical Center or a comparable facility.  If it is determined that the inmate must be

transported by ambulance, the shift supervisor shall arrange for an officer,

either from the jail or from the road division, to accompany the inmate.

. . . .

(Doc. 27-1 at 394-95.)

### 6.      Policy 5120:1-8-09(Q).  Intoxication and Detoxification.

**Policy**.  Inmates of the Ashtabula County Jail who are highly intoxicated, undergoing, or expected to undergo detoxification from alcohol or drug use shall be monitored by staff members to reasonably protect the health and safety of the inmate.

**Procedure**.

1.  Inmates brought to the facility unconscious or displaying serious intoxication will not be accepted in accordance with policy 5120: 1-8-01 (F).

2.  If the inmate's behavior suggests he is under the influence of alcohol, opiates, hypnotics, or other drugs, the inmate will be placed in the first floor holding area for thirty minute observation checks.

3.  Inmates who indicate during the Medical Observation Report (Appendix B) that he or she is or will be detoxifying from alcohol, opiates, hypnotics, or other drugs will be referred to the jail physician, jail nurse or medical officer for an evaluation.  If the jail physician, jail nurse, and the medical officer are not on duty and the inmate is displaying severe detoxification symptoms, the shift supervisor shall notify Jefferson Rescue for an evaluation and transfer to the hospital for treatment.

4.  The jail physician, jail nurse or medical officer may, at their discretion, place the inmate in medical segregation or may refer the inmate to the hospital for treatment.

(*Id.* at 396.)

**B.      Procedural Background**

On May 31, 2023, Defendants removed this action from the Ashtabula County Court of

Common Pleas.  (Doc. 1.)  Plaintiff alleges federal constitutional violations pursuant to 42

U.S.C. § 1983.  (Doc. 1-1 at ¶¶ 16-22.)  He also alleges violations of Ohio law.  (*Id.* at ¶¶ 23-28.)

Defendants timely moved for summary judgment, challenging Plaintiff's claims and

asserting qualified immunity as well statutory immunity on the state law claims.  (Doc. 25.)

Plaintiff responded.  (Doc. 27.)  He did not oppose summary judgment as to Defendant Taryn

Siemers.  (*Id.* at 364.)  Plaintiff disputed the remaining Defendants' assertion of qualified

immunity and statutory immunity.  (*See* Doc. 27.)  Defendants replied.  (Doc. 30.)  Plaintiff

moved for leave to file a sur-reply, which was granted.  (Docs. 32, 32-1; 10/7/2025 Order.)

Plaintiff also moved to strike all or portions of the affidavits Defendants submitted in

support of summary judgment.  (Doc. 29.)  The motion is fully briefed.  (Docs. 31, 33.)

**II.      LAW AND ANALYSIS**

**A.      Standard of Review**

"A party may move for summary judgment, identifying each claim or defense—or the

part of each claim or defense—on which summary judgment is sought."  FED. R. CIV. P. 56(a).

"Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories,

and affidavits show there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  The moving party bears the burden of showing that no

genuine issues of material fact exist."  *Williams v. Maurer*, 9 F.4th 416, 430 (6th Cir. 2021)

(citations and quotations omitted).  A "material" fact is one that "might affect the outcome of the

suit under the governing law[.]"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

2505, 91 L. Ed. 2d 202 (1986).  "[A] genuine dispute of material fact exists if the evidence is

such that a reasonable jury could return a verdict for the non-moving party." *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citations and quotations omitted).

"Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact." *Queen v. City of Bowling Green, Ky.*, 956 F.3d 893, 898 (6th Cir. 2020) (citations and quotations omitted). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co., Inc.*, 395 F.3d 338, 342 (6th Cir. 2005) (citation omitted). A party asserting or disputing a fact must cite evidence in the record or show the record establishes either the absence or the presence of a genuine dispute. *See* FED. R. CIV. P. 56(c), (e). Rule 56 further provides "[t]he court need consider only" the materials cited in the parties' briefs. FED. R. CIV. P. 56(c)(3); *see also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.") (citations omitted).

"Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (citations and quotations omitted). The Court's role is not to make credibility determinations or "weigh" conflicting evidence. *Payne v. Novartis Pharms. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." *Id.*

### B.    Deliberate Indifference to Serious Medical Need

Plaintiff alleged he is entitled to relief against the individual defendants under 42 U.S.C. § 1983. (Doc. 1-1 at 7, 11.) "To state a claim under § 1983, a plaintiff must set forth facts that,

when favorably construed, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citations omitted); *see also West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988).  There is no dispute the individual defendants were acting under color of state law.

The first right at issue is the state's "constitutional obligation to provide medical care to those whom it detains." *Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 566 (6th Cir. 2020).  This right is rooted in the Fourteenth Amendment for pretrial detainees and the Eighth Amendment for convicted prisoners. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005) ("The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishment Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment.").  The Fourteenth Amendment is implicated here because Knight was a pretrial detainee during his time at the Jail.  (Doc. 25-2 at ¶ 15.)

The Due Process Clause of the Fourteenth Amendment forbids jail officials from acting with deliberate indifference toward a pretrial detainee's serious medical needs. *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 605 (6th Cir. 2022) (citation omitted).  Plaintiff claims Defendants Locher, Currier, Whitney, Farina, and Jackson were deliberately indifferent to Knight's serious medical needs.  (Doc. 27 at 377-80.)  Because the standard applied to deliberate indifference claims has fluctuated, some context is helpful.

Historically, a two-part test applied to deliberate indifference claims.  The test included an objective and subjective opponent.  For the objective component, a plaintiff needed to show a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970,

128 L. Ed. 2d 811 (1994).  For the subjective component, the plaintiff needed to show "the official kn[ew] of and disregard[ed] an excessive risk . . . to health or safety."  *Id.* at 837.  In 2015, the Supreme Court eliminated the subjective component from the same test in the context of excessive force claims.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 397-98, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015).  The Supreme Court did not specify whether its holding extended to other claims brought by pretrial detainees.  *See id.*

In 2021, the Sixth Circuit considered whether *Kingsley* applied to deliberate indifference claims.  *See Brawner v. Scott Cnty., Tenn.*, 14 F.4th 585 (6th Cir. 2021).  The Sixth Circuit concluded *Kingsley* required modifying the subjective prong, but did not eliminate it.  *Id.* at 596.  The *Brawner* court held a plaintiff needed to "prove 'more than negligence but less than subjective intent—something akin to reckless disregard.'"  *Id.* (quoting *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)).

On March 29, 2022, the Sixth Circuit decided *Trozzi v. Lake Cnty., Oh.*, 29 F.4th 745 (6th Cir. 2022).  The *Trozzi* court tried to clarify what *Brawner* required.  The *Trozzi* court held that because *Brawner* only modified the subjective prong, courts still needed "to consider the jail official's personal knowledge."  29 F.4th at 754-55.  *Trozzi* stated three elements for a deliberate indifference claim: "(1) the plaintiff had an objectively serious medical need; (2) a reasonable officer would have understood that the plaintiff's medical needs, if untreated, presented an excessive risk of harm; and (3) the prison official knew that his failure to respond would pose a serious risk to the plaintiff, yet he ignored that risk."  *Hulon v. City of Lancing, Mich.*, No. 23-1937, 2025 U.S. App. LEXIS 4086, 2025 WL 817492, at *3 (6th Cir. Mar. 14, 2025) (citing *Trozzi*, 29 F.4th at 757-58).

On February 9, 2023, the Sixth Circuit decided *Helphenstine v. Lewis Cnty., Ky.*, 60 F.4th 305 (6th Cir. 2023).  The court refused to follow *Trozzi*, finding its holding could not be reconciled with *Brawner*.  *See Helphenstine*, 60 F.4th at 315-16.  Instead, *Helphenstine* determined the subjective component requires the plaintiff to prove "each defendant 'acted deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'"  *Id.* at 317 (quoting *Brawner*, 14 F.4th at 596).

As is notable in the qualified immunity context, the timing of the event and the development of the appropriate legal standard must be viewed chronologically.  This is because a plaintiff must prove the challenged conduct violated a clearly established law at the time of the incident.  *See Beck v. Hamblen Cnty., Tenn.*, 969 F.3d 592, 598 (6th Cir. 2020).

In *Lawler v. Hardeman Cnty., Tenn.*, 93 F.4th 919, 927-28 (6th Cir. 2024), the Sixth Circuit held that *Brawner* does not apply to actions taken before it was decided.  But the "inquiry into whether a pretrial detainee has raised a viable deliberate indifference claim is distinct from the analysis of whether a defendant violated clearly established law for purposes of qualified immunity."  *Hulon*, 2025 WL 817492, at *8 n.1 (Stranch, J., dissenting).  The substantive claim is assessed under *Brawner* regardless of when the incident occurred.  *Id.*

The events at issue occurred between April 29, 2022, and May 1, 2022.  The parties dispute whether the subjective test under *Trozzi* or *Helphenstine* controls.  Defendants assert that because *Helphenstine* was decided on February 9, 2023, after the events in this matter, *Trozzi* controls.  (Doc. 25 at 291-92.)  So, consistent with *Trozzi*, Plaintiff must prove Defendants had actual knowledge of the excessive risk to Knight's health and safety.  (*Id.* at 292.)  Plaintiff urges actual knowledge is not necessary under *Brawner* or *Helphenstine*.  (Doc. 27 at 374-75.)

Recent Sixth Circuit case law has applied *Helphenstine* and rejected *Trozzi*'s attempt to alter *Brawner*.  *See Lawler*, 93 F.4th at 927 ("After initial disagreement over what *Brawner* required, we settled on a test that reduced *Farmer*'s subjective element from 'actual knowledge to recklessness.'") (quoting *Helphenstine*, 60 F.4th at 316); *Howell v. NaphCare, Inc.*, 67 F.4th 302, 311 n.3 (6th Cir. 2023) (agreeing with *Helphenstine* and rejecting *Trozzi*); *Mercer v. Athens Cnty., Oh.*, 72 F.4th 152, 161 (6th Cir. 2023) (rejecting *Trozzi* as incompatible with *Brawner*); *Grote v. Kenton Cnty., Ky.*, 85 F.4th 397, 405-06 (6th Cir. 2023) (holding *Trozzi* attempted to resurrect the pre-*Brawner* standard).  The events at issue occurred post-*Brawner*.  Given this precedent, the Court will apply the reckless disregard standard for the subjective inquiry as to each individual defendant.

### 1.      Objective Prong

"[A] condition resulting in death is sufficiently serious to meet the objective component." *Burwell v. City of Lansing, Mich.*, 7 F.4th 456, 463 (6th Cir. 2021) (citation and quotations omitted).  But "[d]eath alone does not suffice to prove the objective prong where the decedent, prior to their death, showed no symptoms of a serious medical need." *Hodges v. Abram*, 138 F.4th 980, 990 (6th Cir. 2025) (no sufficiently serious medical need where decedent denied swallowing drugs, had normal vital signs, "showed no symptoms of drug use, intoxication, overdose, or any other medical condition, and appeared to be in normal health").  An obvious need "is a key factor." *Id.* at 988 (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897-99 (6th Cir. 2004)).  "An injury or illness is 'obvious' when 'even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.*

"'[T]he objective prong is usually met' in overdose cases 'where death results from a failure to provide medical services, and there is evidence that lay persons . . . recognized the necessity for a doctor's attention.'" *Burwell*, 7 F.4th at 464 (quoting *Hinneburg v. Miron*, 676 F.

App'x 483, 486-87 (6th Cir. 2017)).  If a medical need is not obvious, it generally must be diagnosed by a physician as mandating treatment.  *Hodges*, 138 F.4th at 988 (citations omitted).  While drug or alcohol-related symptoms can be sufficiently serious, the symptoms must manifest in an obvious need for medical care.  *See Hinneburg*, 676 F. App'x at 484-87 (extreme nature of inmate's intoxication met objective prong where other inmates testified decedent was visibly high, nodding, talking to herself, and dropping her head); *Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 836-38 (6th Cir. 2011) (detainee's medical need was obvious where he appeared "visibly intoxicated," "huddled and slumped over," had red and glazed eyes, "had difficulty walking and staying awake," and had slurred speech); *Bertl v. City of Westland*, No. 07-2547, 2009 U.S. App. LEXIS 2086, 2009 WL 247907, *6 (6th Cir. Feb. 2, 2009) (inmate who died of severe alcohol poisoning met objective component where he was "lying face down on the floor of his cell, almost comatose, unresponsive, and having seizure-like spasms").

Defendants concede Knight had a serious medical need when he overdosed around 3:44 AM on May 1, 2022.  (Doc. 25 at 292.)  But they dispute he had a serious medical need before that.  (*Id.* at 292-93; Doc. 30 at 726-28.)  Knight's vitals were normal.  (*Id.*)  He displayed no signs of overdosing during observation, regular security checks, or over surveillance video.  (*Id.*)

Plaintiff argues Knight had an obvious serious medical need before his fatal overdose.  (Doc. 27 at 377.)  For his part, Plaintiff points to Knight's erratic behavior before he was pulled from the Unit.  (*Id.* at 377-78.)  His drug test was positive for heroin.  (*Id.*)  And Knight admitted to using drugs.  (*Id.*)  To Plaintiff, a lay person should understand the obvious risks associated with heroin use.  (*Id.* at 378.)  Plaintiff directs the Court to cases where the decedent displayed obvious signs of medical distress.  (*Id.* (citing *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (decedent exhibited severe signs of heroin withdrawal, later began vomiting, had

diarrhea, and was seen lying on cell floor); *Stefan v. Olson*, 497 F. App'x 568, 577 (6th Cir.

2012) (intoxicated decedent had elevated blood pressure and history of withdrawal seizures);

*Helphenstine*, 60 F.4th at 317-18 (decedent vomited and told staff he was "dope sick"); *Grote*, 85

F.4th at 401 (decedent had clearly abnormal vital signs, was covered in sweat, was shaking and

twitching, lacked basic motor control, and told staff he had taken methamphetamine)).)

      But none of these cases align with the facts here.  In each, vitals were abnormal or there

was some other indication (i.e., vomiting) to alert staff to a medical concern.  Not so here.

Knight's positive drug test and admission are not enough to show an obvious medical need

before he overdosed.  In viewing the facts in the light most favorable to Plaintiff, the undisputed

facts are as follows.  Knight was pulled from the Unit after acting erratically.  (Doc. 25-4 at ¶ 10;

Doc. 25-5 at ¶ 8.)  He was strip searched and drug tested.  (Doc. 25-3 at ¶¶ 20, 22, 23, 24; Doc.

25-3 at 324; Doc. 25-4 at ¶¶ 10, 14; Doc. 25-5 at ¶¶ 11, 14; Doc. 25-7 at ¶ 8.)  Knight tested

positive and admitted to using drugs the previous night.  (Doc. 25-3 at ¶ 24; Doc. 25-4 at ¶¶ 14,

18; Doc. 25-5 at ¶ 14.)  He claimed to have no additional drugs.  (*Id.*)  His vitals were normal.

(Doc. 25-3 at ¶ 27; Doc. 25-4 at ¶ 16.)  Knight was observed for one hour.  (Doc. 25-3 at ¶ 30.)

All officers observed Knight acting normally and saw no sign of medical distress before

returning him to the Unit.  (Doc. 25-3 at ¶¶ 21, 25, 30; Doc. 25-4 at ¶¶ 11, 19; Doc. 25-5 at ¶¶ 9,

15, 17; Doc. 25-6 at ¶¶ 17, 20, 21; Doc. 25-7 at ¶¶ 9, 11.)  No signs of medical distress were seen

during the security checks at 3:16 AM, 3:43 AM, and 4:43 AM.  (Doc. 25-2 at ¶¶ 21, 22.)  He

appeared to be resting peacefully over surveillance video.  (Doc. 25-4 at ¶ 21.)

      It is undisputed Knight had a sufficiently serious medical need when he overdosed.  (Doc.

25 at 292.)  But the facts do not support that Locher, Currier, Whitney, Farina, or Jackson were

present when the serious medical need arose.  Nor do the facts support that any individual

defendant observed signs of an obvious medical need any time earlier.  The objective prong has not been established.  But even if Plaintiff could establish the objective prong for his deliberate indifference claim, he has failed to establish the subjective prong as to any individual defendant.

### 2.      Subjective Prong

The subjective prong focuses on whether the individual defendants knew or should have known of an unjustifiably high risk of harm to Knight, and whether they acted deliberately and recklessly in the face of it.  *Helphenstine*, 60 F.4th at 317.  The Court must analyze the subjective prong for each defendant individually.  *Id.* (citing *Greene*, 22 F.4th at 607).

"'[A] pretrial detainee's generalized state of intoxication, without more, is insufficient to establish . . . an officer's deliberate indifference to a substantial risk of serious harm to a detainee.'"  *Burwell*, 7 F.4th at 473 (citing *Border*, 414 F. App'x at 837); *see also Hinneburg*, 676 F. App'x at 487-88 (defendants were not subjectively aware of overdosing inmate's serious medical need because they thought she was only intoxicated, did not know she had taken drugs, and did not observe behavior indicative of an overdose); *Smith v. Erie Cnty. Sheriff's Dep't*, 603 F. App'x 414, 419-21 (6th Cir. 2015) (defendants were not subjectively aware of overdosing inmate's serious medical need because they thought she was only intoxicated and not in need of immediate medical care).

Plaintiff essentially asserts Locher, Currier, Whitney, Farina, and Jackson should have done more to prevent Knight from overdosing.  But Plaintiff has presented no evidence that these defendants knew or had reason to know Knight sewed a makeshift pocket into his sock, let alone that it contained a fatal dose of heroin.  It is undisputed each rushed to provide aid and immediately requested medical care when they realized Knight was in distress.

### a)    Corporal Dale Locher

Locher was told Tressler may have concealed drugs at booking.  (Doc. 25-3 at ¶ 12.) Tressler was patted down and strip searched.  (*Id.* at ¶ 14.)  No contraband was found.  (*Id.* at ¶ 16.)

Locher kept the individuals, including Knight, "in observation for a period of time to ensure they were not exhibiting any symptoms of drug use or of other medical issues."  (*Id.* at ¶ 26.)  He did not see Knight acting strangely in the earlier security footage.  (*Id.* at ¶ 21.) Knight was not acting strangely when brought down for observation.  (*Id.*)  Locher recalled Knight tested positive for drugs.  (*Id.* at ¶ 24.)  Locher knew Knight's vitals were taken.  (*Id.* at ¶ 27.)  He was not informed of any medical concerns particular to Knight.  (*Id.*)  Locher returned Knight to the Unit after Knight was observed for approximately one hour.  (*Id.* at ¶ 30.)  Locher did not observe any symptoms of drug use or medical issues.  (*Id.*)  No drugs were found on Knight or any other individuals in the Unit during the strip searches.  (*Id.*)

Plaintiff argues Locher was required to call the Jail nurse, physician, or Jefferson rescue. (Doc. 27 at 378.)  It is undisputed he did not.  (*Id.*)  Even if Locher's failure to call for medical assistance violated Jail policy (which would have occurred *if* Locher believed Knight was in distress), "'the failure to follow internal policies, without more, [does not] constitute deliberate indifference[.]'"  *Blaine v. Louisville Metro. Gov't*, 768 F. App'x 515, 530 (6th Cir. 2019) (quoting *Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018)); *see also Griffith v. Franklin Cnty., Ky.*, 975 F.3d 554, 571, 578 (6th Cir. 2020) (holding an officer's failure to follow a jail policy established "at most, a negligence claim" not actionable under § 1983); *Hyman v. Lewis*, 27 F.4th 1233, 1237-38 (6th Cir. 2022) (quoting *Winkler* and holding "[Defendant] no doubt violated the jail's operating procedures.  But 'failure to follow internal policies, without

more, does not equal deliberate indifference.").  Testimony from Jail officials who, in hindsight, believed Locher was required to call for medical assistance does not establish a constitutional violation.  (*See* Doc. 27 at 378 (citing Doc. 28-2 at 464; Doc. 28-6 at 621-22.).)

The same is true for whether Locher should have kept Knight under observation for longer.  Knight was continuously observed for one hour before returning to his Unit.  Even if Locher's actions amounted to policy violations, such violations are not actionable.  *See Blaine*, 768 F. App'x at 530; *Griffith*, 975 F.3d at 571, 578.  Locher was not deliberately indifferent.

### b)  Officer Merissa Currier

After Currier saw Hommes acting strangely, she reviewed security footage from the previous day.  (Doc. 25-4 at ¶¶ 7, 9, 10.)  She saw erratic behavior from other individuals in the Unit, including Knight.  (*Id.* at ¶ 10.)  Currier searched the Unit with Siemers.  (*Id.* at ¶ 12.)  They did not find any contraband in Knight's bunk area.  (*Id.* at ¶ 13.)

Currier took Knight's vitals while he was under observation in the booking area.  (*Id.* at ¶ 16.)  Knight's vitals were normal.  (*Id.*)  Knight told Currier he had "used" the previous night, but he did not have more drugs.  (*Id.* at ¶ 18.)  Currier did not think Knight was in medical distress before he returned to the Unit.  (*Id.* at ¶¶ 11, 19.)

Currier did a walkthrough security check shortly after Knight returned to the Unit.  (*Id.* at ¶ 20.)  Knight was in the bathroom and told Currier he was getting ready for bed.  (*Id.*)  Currier also watched Knight on surveillance video after he returned to his bunk.  (*Id.* at ¶ 21.)  She thought he was resting peacefully.  (*Id.*)

Plaintiff argues Defendants are incorrect that Knight's erratic behavior occurred on April 29, 2022.  (Doc. 30 at 723; Doc. 32-1 at 742.)  Because the relevant events took place in the early morning hours of May 1, 2022, the "previous day" means a few hours prior on April 30,

2022.  (*Id.*)  This does not create a genuine issue of fact for a jury.  Even if Currier saw Knight acting erratic a few hours before, it is undisputed Currier believed Knight was not in medical distress when under subsequent observation.  (Doc. 25-4 at ¶¶ 11, 19.)

Plaintiff argues the lack of Emergency Medical Response Report for Knight leads to the inference his vitals were never taken or were abnormal.  (Doc. 27 at 379.)  An Emergency Medical Response Report exists for Hommes, who had an elevated heart rate.  (Doc. 28-1 at 444.)  Plaintiff directs the Court to Jail policy and testimony from Jail officials that any time vitals were taken, an Emergency Medical Response Report should have been completed.  (*See* Doc. 27 at 369, 379 citing (Doc. 28-5 at 563; Doc. 28-1 at 415; Doc. 28-2 at 475; Doc. 28-6 at 621).)

Currier recalled taking Knight's vitals.  Even if her failure to complete an Emergency Medical Response Report violated Jail policy, it does not amount to deliberate indifference.  *See Blaine*, 768 F. App'x at 530; *Griffith.*, 975 F.3d at 571, 578.  Currier was not deliberately indifferent.

### c)  Officer Brian Whitney

After Hommes was seen acting strangely, Whitney reviewed security footage from the previous day.  (Doc. 25-5 at ¶ 8.)  Whitney did observe some erratic behavior from known associates of Hommes.  (*Id.*)  Whitney did not see Knight acting strangely in the security footage or while under observation.  (*Id.* at ¶ 9.)

Whitney reported to the chapel area with Jackson to conduct strip searches.  (*Id.* at ¶ 11.) Whitney did not find any contraband on Knight.  (*Id.* at ¶ 13.)  He knew Knight tested positive for drugs.  (*Id.* at ¶ 14.)  Whitney did not believe Knight was in medical distress while Whitney

was searching and monitoring him.  (*Id.* at ¶ 15.)  Whitney also did not see Knight acting strangely during regular security checks.  (*Id.* at ¶ 18.)

Plaintiff questions whether the strip search took place.  (Doc. 27 at 379-80.)  To Plaintiff, if Knight was strip searched, officers would have found the drugs sewn into Knight's sock.  (*Id.*)  But it is Plaintiff's burden to cite to evidence in the record that demonstrates the presence of a genuine dispute on this point.  He has not done so.  (*See id.*)  Whitney recalls conducting the search, and a Strip Search Report was prepared.  (Doc. Doc. 25-5 at ¶ 13; Doc. 25-3 at 324.)  Whitney was not deliberately indifferent.

### d)  Officer Cole Farina

Farina did not recall being told Tressler may have drugs in his rectum.  (Doc. 25-6 at ¶ 7.)  Farina also did not recall finding contraband on Tressler during booking.  (*Id.* at ¶ 12.)

Farina did not see Knight acting strangely, under the influence, or in medical distress when Knight was under observation.  (*Id.* at ¶¶ 15, 17, 20.)  He learned Knight's vitals were normal.  (*Id.* at ¶ 19.)  Farina did not observe Knight acting strangely during regular security checks or on the surveillance cameras.  (*Id.* at ¶ 22.)

Farina did not believe Knight was in medical distress.  He was not deliberately indifferent.

### e)  Officer Mark Jackson

Jackson assisted Whitney with the strip searches in the chapel area.  (Doc. 25-7 at ¶¶ 7, 8.)  Jackson monitored the individuals in the waiting area.  (*Id.*)  He did not recall Knight acting abnormally, in medical distress, or under the influence while he was monitoring Knight.  (*Id.* at ¶ 9.)  No drugs or contraband were found on Knight.  (*Id.* at ¶ 10.)

Jackson continued to monitor Knight and other individuals via surveillance cameras after they were returned to the Unit.  (*Id.* at ¶ 12.)  He did not observe Knight acting abnormally.  (*Id.* at ¶ 14.)

Plaintiff points to Jackson's deposition testimony to assert officers failed to monitor Knight over surveillance video after returning Knight to the Unit.  (Doc. 27 at 380.)  At his deposition, Jackson was asked if he knew whether anyone was watching the monitors between 12:00 AM and 5:00 AM on May 1, 2022.  (Doc. 28-6 at 625.)  Jackson responded, "I don't remember.  I don't believe – I don't think so.  I don't know.  I'm sure everybody was, but I don't know.  I don't remember that."  (*Id.*)

Currier and Farina also attested to monitoring surveillance footage after Knight returned to the Unit.  (*See* Doc. 25-4 at ¶ 21; Doc. 25-6 at ¶ 22.)  Plaintiff does not dispute these facts.  Even if Jackson's failure to watch the surveillance video constitutes a violation of Jail policy, that is not actionable.  *See Blaine*, 768 F. App'x at 530; *Griffith*, 975 F.3d at 571, 578.  Jackson did not believe Knight was in medical distress.  He was not deliberately indifferent.

Ultimately, the undisputed facts, even when viewed in the light most favorable to Plaintiff, do not establish Locher, Currier, Whitney, Farina, or Jackson were deliberately indifferent to Knight's serious medical needs.  While Knight's death is certainly tragic, Plaintiff's arguments support a negligence theory based on hindsight.  But that is not actionable.  *See Trozzi*, 29 F.4th at 756 ("Borrowing from *Kingsley*, *Brawner* explained that a detainee raising a Fourteenth Amendment medical deprivation claim must show that a reasonable officer at the scene—not one 'with the 20/20 vision of hindsight'—would have known the detainee's medical needs posed an excessive risk.") (citing *Kingsley*, 576 U.S. at 397).  Plaintiff has not

established that the individual defendants committed a constitutional violation.  The deliberate indifference claim fails.

### C.      Failure to Protect

"[A] failure-to-protect claim by a pretrial detainee requires only an objective showing that an individual defendant acted (or failed to act) deliberately and recklessly."[3]  *Westmoreland v. Butler Cnty., Ky.*, 29 F.4th 721, 728 (6th Cir. 2022).  A plaintiff must show the defendant acted intentionally in a manner that put the detainee at substantial risk of serious harm, without taking reasonable steps to abate that risk, and actually caused the detainee's injuries by failing to do so.  *Id.* at 729.  Where a plaintiff brings a failure-to-protect claim based on a drug overdose, like here, "simple exposure to drugs, without more" does not demonstrate an objectively excessive risk of overdose.  *Zakora v. Chrisman*, 44 F.4th 452, 472 (6th Cir. 2022).  Plaintiff must establish Knight was at serious risk of injury from "unfettered access to drugs."  *Id.* at 472.  "Prison officials are not required to show that they have prevented all drugs from entering their facility in order to be protected from liability."  (*Id.*)  Plaintiff must show: (1) "widespread presence of drugs" at the facility; (2) immediate prior overdoses; and (3) failure to investigate those overdoses.  *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 684 (6th Cir. 2024).

Plaintiff claims Defendants Locher, Antoun, and Niemi were all responsible for preventing drugs from entering the Jail.  (Doc. 27 at 376, 382-83.)  He asserts Locher knew the risk of drugs coming into the Jail and disregarded that risk.  (*Id.* at 382.)  Locher had the requisite probable cause to conduct a more invasive search of Tressler before booking him into the Jail but allowed him in through normal booking procedures.  (*Id.*)  Plaintiff directs the Court to what he

---

[3] While both parties briefed the failure to protect claim under the Eighth Amendment, Knight was a pretrial detainee and the Fourteenth Amendment controls.  (*See* Doc. 27 at 376, 382-83; Doc. 25 at 293-95; Doc. 30 at 731-33; *see also Lawler*, 93 F.4th at 926.)

characterizes as evidence of a widespread presence of drugs at the Jail. (*Id.* at 372-73, 382-83.) He further claims "drug issues were not new to the Jail" because drugs had been found in individuals' rectums after a full search. (*Id.* (citing Doc. 28-2 at 465.) Antoun and Niemi did not promulgate policies on this issue. (*Id.* (citing Doc. 28-1 at 423, 425).) Plaintiff directs the Court to one other instance where individuals brought drugs into the Jail through a rope strung out a window. (*Id.* (citing Doc. 28-2 at 465).)

In viewing the facts in the light most favorable to Plaintiff, this claim still fails. Even if there was probable cause to subject Tressler to a more invasive search at booking, Plaintiff has not shown an objectively excessive risk of overdose. The evidence Plaintiff relies on to demonstrate widespread presence of drugs at the Jail fails as a matter of law. Although individuals attempted to bring contraband into the Jail, such attempts were largely prevented with pat down and strip searches. (Doc. 25-2 at ¶ 14; Doc. 25-3 at ¶ 38; Doc. 25-4 at ¶ 27; Doc. 25-5 at ¶ 23.) Individuals rarely succeeded in getting contraband into the Jail. (Doc. 25-2 at ¶ 14; Doc. 25-3 at ¶ 37; Doc. 25-4 at ¶ 26; Doc. 25-5 at ¶ 22.) Plaintiff also failed to provide evidence of immediate prior overdoses and failure to investigate those overdoses. In fact, Knight's overdose is the only overdose Jail officials recalled during their tenure. (Doc. 25-2 at ¶ 16; Doc. 25-3 at ¶ 36; Doc. 25-4 at ¶ 25; Doc. 25-5 at ¶ 21; Doc. 25-6 at ¶ 25; Doc. 25-7 at ¶ 18.) Plaintiff has not stated a claim for a failure to protect Knight from access to drugs.

### D.   Governmental Immunity

#### 1.   Federal Qualified Immunity

"The doctrine of qualified immunity provides that 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 738 (6th Cir. 2022) (quoting *Williams*, 9 F.4th at 430).

Once asserted by a defendant, a "[p]laintiff bears the burden of showing that defendants are not entitled to qualified immunity."  *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018) (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009)).  The plaintiff must demonstrate both the challenged conduct violated a constitutional right and the right was clearly established.  *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014).  "If the plaintiff fails to establish either element, the defendant is immune from suit."  *Id.*; *see also Barber v. Miller*, 809 F.3d 840, 844 (6th Cir. 2015).  "Between these two considerations, [the Court] may take them in either order.  *Hall v. Navarre*, 118 F.4th 749, 759 (6th Cir. 2024) (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)).

Locher, Currier, Whitney, Farina, Jackson, Antoun, and Niemi have asserted qualified immunity.  Because this Court finds Plaintiff has not met his burden of showing any of these defendants violated a constitutional right, it need not resolve whether the right at issue was clearly established.  Locher, Currier, Whitney, Farina, Jackson, Antoun, and Niemi are entitled to qualified immunity.

## 2.      State Statutory Immunity

"When federal qualified immunity and Ohio statutory immunity under § 2744.03(A)(6) rest on the same questions of material fact, [a court] may review the state-law immunity defense 'through the lens of the federal qualified immunity analysis.'"  *Hopper v. Phil Plummer*, 887 F.3d 744, 759 (6th Cir. 2018) (quoting *Chappell*, 585 F.3d at 907 n.1).  As discussed above, the individual defendants did not violate a constitutional right and are entitled to qualified immunity.  Accordingly, Locher, Currier, Whitney, Farina, Jackson, Antoun, and Niemi are entitled to Ohio statutory immunity against Plaintiff's state law claims.

E.      *Monell* Failure to Train

Plaintiff brings a § 1983 claim against Defendants Ashtabula County and the Ashtabula County Sheriff's Department pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  (Doc. 27 at 380-81.)  For a municipal entity to be subject to liability under *Monell*, the Court considers whether Plaintiff's harm was caused by a constitutional violation, and if so, whether the municipal entity is responsible for that violation. *See Lee v. Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 449 (6th Cir. 2011) (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)).  "However, '[t]here can be no liability under *Monell* without an underlying constitutional violation.'"  *Chambers v. Sanders*, 63 F.4th 1092, 1101-02 (6th Cir. 2023) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986).

As discussed above, there is no underlying constitutional violation on which to predicate a *Monell* claim.

F.      **Spoliation**

"A party seeking sanctions for an opponent's spoliation of evidence must show: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the [evidence] was destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'"  *Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F. Supp. 3d 987, 995 (N.D. Ohio 2016) (citing *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010)).

Under Rule 37(e)(2), "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," the Court may "presume that the lost

information was unfavorable," "instruct the jury that it may or must presume the information was unfavorable," or "dismiss the action or enter a default judgment."  An adverse inference instruction is an appropriate sanction when the destruction of evidence "severely compromise[s]" the opposing party's case.  *Beaven*, 622 F.3d at 555.  The Court must find "the defendant intended to deprive the plaintiff of the use of [the destroyed evidence]."  *Cap. Senior Living, Inc. v. Barnhiser*, 713 F. Supp. 3d 407, 418 (N.D. Ohio 2024).  "'Negligent or even grossly negligent behavior' is not enough" for an adverse inference.  *Id.* (citing FED. R. CIV. P. 37, 2015 Advisory Comm. Note); *see also Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 772 (6th Cir. 2025) (declining to impose Rule 37(e)(2) sanctions was not abuse of discretion where failure to preserve documents was only grossly negligent and not intentional); *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016) (plaintiff offered no evidence some of the records existed, much less defendant destroyed them with a culpable state of mind).

Plaintiff does not identify or engage with this legal framework.  Nor does he move for relief under Rule 37.  (*See* Doc. 27.)  He simply references the desired sanction in his opposition brief.  (*Id.*)  In the legal standard section, Plaintiff includes the following sentence: "Significant adverse inferences for the adverse party may be drawn from the destruction of relevant evidence under an adverse party's control."  (Doc. 27 at 374 (citing *Crown Battery Mfg. Co.*, 185 F. Supp. 3d 987; *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009).)  Plaintiff's statement of facts includes a section on "Destroyed Evidence."  (Doc. 27 at 373.)  In other places in his brief, he references being entitled to an adverse inference.  (*See id.* at 363, 364, 379, 380.)  But no analysis follows.  Plaintiff's opposition brief never specifies he is moving for sanctions under Rule 37(e)(2) or what he must show to obtain them.

According to Plaintiff, Antoun failed to produce an Emergency Medical Response Report for Knight, and she failed to preserve surveillance video from the chapel and booking areas.  (*Id.* at 373.)  The events at issue occurred between April 29, 2022, and May 1, 2022.  On May 7, 2022, Plaintiff's counsel sent certified letters to Antoun and Sheriff Niemi to preserve all evidence, including surveillance video and reports.  (Doc. 27 at 373; Doc. 27-1 at 386-93.)  Antoun received the letter.  (Doc. 28-5 at 571.)  She did not recall when she received it.  (*Id.*)

Antoun and others testified an Emergency Medical Response Report should have been completed if Knight's vitals were taken.  (Doc. 28-5 at 563; Doc. 28-1 at 415; Doc. 28-2 at 475; Doc. 28-6 at 621.)  Antoun also testified the chapel surveillance video of the strip searches was not preserved.  (Doc. 28-5 at 570.)  Antoun viewed the video during her initial review the weekend of the incident.  (*Id.* at 570-71.)  But she did not set it aside for preservation.  (*Id.*)  Because it was not separately preserved, it was automatically overwritten after three months.  (*Id.*)  Notwithstanding, she believed the booking observation video was preserved and provided.  (*Id.* at 571.)  To Plaintiff, the missing surveillance video and Emergency Medical Response Report raise the adverse inference that Knight's vitals were never taken or were abnormal, Knight's erratic behavior continued during observation, and he was never strip searched.  (*Id.* at 379-80.)

Plaintiff's cursory case law citations and vague references to an adverse inference, without more, are insufficient to satisfy his burden under Rule 37(e)(2).  As discussed above, Plaintiff has not demonstrated Defendants were obligated to complete an Emergency Medical Response Report for Knight under Jail policy.  (*See* Doc. 27-1 at 394-95.)  At most, witnesses testified in hindsight that an Emergency Medical Response Report should have been filled out for Knight.  (Doc. 28-5 at 563; Doc. 28-1 at 415; Doc. 28-2 at 475; Doc. 28-6 at 621.)  Plaintiff

has not shown an Emergency Medical Response Report was created for Knight, let alone Defendants failed to preserve it.

As to the missing surveillance video, Plaintiff's request for an adverse instruction hinges on the fact that the surveillance video is unavailable.  But that is not enough.  Plaintiff must show the video was destroyed intentionally.  "A showing of negligence or even gross negligence will not do the trick." *Applebaum*, 831 F.3d at 745 (citing Fed. R. Civ. P. 37, 2015 Advisory Comm. Note).  Plaintiff has not shown the video was destroyed with a culpable state of mind.  *See Cantrell v. Scioto Cnty., Oh.*, No. 22-cv-739, 2025 U.S. Dist. LEXIS 193208, 2025 WL 2780816, at *12 (S.D. Ohio Sept. 30, 2025) (request for adverse inference in summary judgment opposition insufficient; plaintiff failed to identify or engage with legal standard); *Larrick v. Tuscarawas Cnty.*, No. 21-cv-00959, 2023 U.S. Dist. LEXIS 173601, 2023 WL 6311396, at *18-20 (N.D. Ohio Sept. 28, 2023) (request for adverse inference in summary judgment opposition insufficient; plaintiff failed to show defendant lost the video with intent to deprive plaintiff of its use).  Plaintiff has not demonstrated he is entitled to an adverse inference sanction.

### G.     Motion to Strike

A motion to strike applies only to pleadings.  *See* Fed. R. Civ. P. 12(f); *see also Stephenson v. Fam. Sols. of Ohio, Inc.*, No. 18CV2017, 2021 U.S. Dist. LEXIS 38754, 2021 WL 795551, at *5 (N.D. Ohio Mar. 2, 2021) ("a motion to strike is not the proper vehicle for attacking exhibits filed in support of, or in opposition to, motions for summary judgment"). "Motions to strike should be construed as objections under Rule 56(c)(2)." *Smith v. Interim HealthCare of Cincinnati, Inc.*, No. 10-cv-582, 2011 U.S. Dist. LEXIS 138885, 2011 WL 6012971, at * 4 (S.D. Ohio Dec. 2, 2011) (citations omitted).  The Court will construe Plaintiff's Motion to Strike as objections under Rule 56(c)(2).

Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). The burden is then placed on the proponent of the supporting material to demonstrate that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *See Mangum v. Repp*, 674 F. App'x 531, 536-37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) (2010 Advisory Comm. Notes) (finding challenged evidence would be admissible as direct trial testimony)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (summary judgment evidence need not be in a form that would be admissible at trial).

Plaintiff moves to strike the affidavits Defendants submitted in support of their summary judgment motion. (Doc. 29.) Plaintiff argues the affidavits are not based upon the affiants' personal knowledge. (*Id.* at 719-21.) Statements made on information and belief do not satisfy the personal knowledge requirement, Plaintiff urges. (*Id.*) Plaintiff notes the affidavits each lack a statement they are based upon the affiants' personal knowledge. (*Id.* at 720.) They should be stricken on that basis. (*Id.*) Alternatively, Plaintiff lists specific portions of affidavits that should be stricken as not based on personal knowledge or as "inadmissible hearsay." (*Id.* at 720-21.)

In response, Defendants assert the affidavits are based on personal knowledge. (Doc. 31 at 735.) Each affiant was present during the relevant events. (*Id.* at 736-38.) And personal knowledge may be inferred from the content of the statements. (*Id.*) The affidavits do not state they are based upon information and belief. (*Id.*) Plaintiff takes issue with the word "recall," but recollection indicates information is based on personal knowledge, Defendants urge. (*Id.*)

Plaintiff cites to *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 956 (S.D. Ohio 2000) for his assertion that the affidavits are insufficient under Rule 56. First,

the challenged affidavits do not state that they are made on information and belief.  Rather, they state they are based on the affiant's "own knowledge and information."  (*See* Doc. 25-1 at ¶ 1; Doc. 25-2 at ¶ 1; Doc. 25-3 at ¶ 1; Doc. 25-4 at ¶ 1; Doc. 25-5 at ¶ 1; Doc. 25-6 at ¶ 1; Doc. 25-7 at ¶ 1; Doc. 25-8 at ¶ 1; Doc. 25-9 at ¶ 1; Doc. 25-10 at ¶ 1.)  And as stated in *Reddy*, "personal knowledge may be inferred from the content of the statements . . . [and] may also flow logically from the context of the affidavit."  137 F. Supp. 2d at 956.  Plaintiff also asserts the statement "I recall" does not signify personal knowledge.  (Doc. 29 at 720.)  But "the term 'recollection' indicates that the information is based on personal knowledge."  *Reddy*, 137 F. Supp. 2d at 956.

Here, Defendants demonstrated the affiants were present and on duty at the Jail during the relevant events.  (Doc. 31 at 736-38.)  The affidavits, including what each affiant "recalls," are based on each affiant's personal observations of those events.  (*Id.*)  Even if the affidavits are in an inadmissible form, the officers on duty that night could give admissible testimony at trial. *See Mangum*, 674 F. App'x at 537.  And to the extent Plaintiff challenges the cited paragraphs as "inadmissible hearsay," Plaintiff does not support his vague hearsay assertions with legal authority.  (*See* Docs. 29, 33.)  Plaintiff's objections to the affidavits, or specific portions thereof, are overruled.

## III.    CONCLUSION

For the reasons stated herein, Defendants' Motion for Summary Judgment (Doc. 25) is GRANTED.  Plaintiff's Motion to Strike All or Portions of the Affidavits Submitted by Defendants in Support of Summary Judgment (Doc. 29) is DENIED.

**IT IS SO ORDERED.**

**Date:**  December 12, 2025

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE